[Civ. No. 13632. Third Dist. Mar. 8, 1973.]

THE PEOPLE ex rel. HOUSTON I. FLOURNOY, as State Controller,
Plaintiff and Respondent, v.
YELLOW CAB COMPANY, Defendant and Appellant.

## COUNSEL

Chickering & Gregory, William L. Ferdon, David R. Pigott and James G. Leathers, Jr., for Defendant and Appellant.

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Timothy G. Laddish, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—This appeal involves Yellow Cab Company's liability for the state transportation tax on automobile carriers for a period of 11 months ending September 30, 1966.

The taxing statute is the Motor Vehicle Transportation License Tax Law (Rev. & Tax. Code, § 9601 et seq.). The tax is administered by the State Board of Equalization. Generally, the tax is imposed on "operators" who transport passengers or property for hire on public highways outside of incorporated cities. (Rev. & Tax. Code, §§ 9603, 9651.)[1] The tax is at the rate of 1½ percent of gross receipts. Because its principal impact is on compensated transportation in unincorporated areas, it features several exclusions aimed at relieving carriers who operate primarily within cities. Thus, ever since its 1933 enactment, the statute has excluded carriers who operate wholly within incorporated cities; nor does it cover gross receipts derived from transportation wholly within incorporated cities. These two exclusions are described in subdivisions (a) and (b) of Revenue and Taxation Code section 9653. To these two exclusions the 1955 legislature added a third, set out in subdivision (c) of the same section. In effect, the additional exclusion deals with a carrier who transports passengers partially within a city; it is called into action when the city imposes a tax or franchise or license fee *measured by the gross receipts derived from the transportation of passengers;* it excludes from the measure of the state tax that portion of the carrier's gross receipts attributable to operations within the city.[2]

The exclusion described in subdivision (c) of section 9653 is at the root of this lawsuit. San Francisco International Airport, owned and operated

---

[1]Although the tax covers carriers of passengers as well as goods, it is sometimes called the "truck tax." (Gould, J., The California Tax System, West's Annotated Cal. Codes, Rev. & Tax. Code, vol. 1, at pp. 86-87.) The tax goes out of existence July 1, 1973, but the tax law will continue to govern collections and refunds accruing before that date. (Stats. 1972, ch. 563.) We direct publication of this opinion on the assumption that other tax periods and, possibly, other taxpayers, may be affected. (Cal. Rules of Court, rule 976.) .

[2]We quote the full text of section 9653, subdivision (c): "(c) If any incorporated city imposes any tax or any franchise or license fee *measured by the gross receipts derived from the transportation of passengers* and any operator engages in the transportation of passengers partly within and partly without the city, the tax imposed by this part does not apply to the portion of the gross receipts attributable to operations within the city and included in the measure of the city tax or fee. The amount of gross receipts to which the tax does not apply under this subdivision shall not exceed the proportion of the operator's gross receipts that the mileage operated within the city bears to the entire mileage over which the operations extend." (Italics supplied.)

by the City and County of San Francisco, is located in San Mateo County. Transportation firms serving the airport travel through an unincorporated area between the airport and the southerly boundary of San Francisco, thus incurring liability for the state transportation tax. By a contract effective November 1, 1964, San Francisco granted Yellow Cab Company the exclusive privilege of picking up passengers leaving the airport by metered taxicab. For this privilege Yellow Cab undertook to pay San Francisco a monthly exaction of 4.55¢ for each "off-passenger" (defined as an aviation passenger disembarking at the airport and included in the airport's monthly statistics) during the preceding month, or a minimum of $7,500 per month.

After commencing operations under its airport contract, Yellow Cab Company included in its monthly state tax returns the gross receipts created by the fares of passengers it carried from the airport. Believing itself entitled to the exemption established by section 9653, subdivision (c), it then applied for a partial refund. Its theory was that the exaction it paid San Francisco (4.55¢ per "off-passenger") came within the terms of section 9653, subdivision (c), entitling it to an exemption covering that portion of the taxi trip which lay entirely within San Francisco's boundaries. The Board of Equalization agreed and ordered the refund. Later, the board decided that it had been in error and sued Yellow Cab for return of the refund. The trial court sustained the board's position and awarded a judgment covering the refund. Yellow Cab appeals.

The exemption statute is evoked only when the city imposes a tax or fee "measured by the gross receipts derived from the transportation of passengers . . . ." We take judicial notice that during the 11-month period in question the City and County of San Francisco imposed no generally applicable tax or fee on passenger carriers such as bus and taxicab companies. (Evid. Code, § 452, subd. (b).) Not until 1968 did San Francisco impose a business tax applicable to passenger carriers. (S.F. Ord. 245-68, eff. 10/1/68.) Not until 1969 did San Francisco measure this tax by the carriers' gross receipts. (S.F. Ord. 262-69, operative Jan. 1, 1969.)

The airport exaction or fee paid by Yellow Cab was not measured by the company's gross receipts, but by the number of "off-passengers" at the International Airport. Thus it was literally outside the terms of section 9653, subdivision (c). A literal view of the statute bars Yellow Cab from the exemption.

On behalf of the taxing agency, the Attorney General points out that the statutory phrase "measured by the gross receipts" is unambiguous and requires no interpretation. The point has some validity. (See *Pacific Gas & Elec. Co.* v. *Roberts* (1917) 176 Cal. 183, 189 [167 P. 845]; *Pacific*

*Greyhound Lines* v. *Johnson* (1942) 54 Cal.App.2d 297, 302 [129 P.2d 32].) Courts increasingly resist obedience to "plain meaning," for blind literalness may sometimes defeat the Legislature's central objective. Though ambiguity is a precondition of interpretation, the literal meaning of a statutory phrase may be disregarded in order to fulfill the objective of the entire statute. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 849, fn. 6 [59 Cal.Rptr. 609, 428 P.2d 593].) It is not enough to say that the exemption arises from the form of the taxpayer's airport contract, not enough to say that the draftsmen of the contract chose an unfortunate formula, or that another formula or other words may have triggered another result. The exemption is a product of statutory purpose as well as statutory language. Discord between contract verbiage and statutory verbiage is not the only factor in the tax exemption's denial. The arrangement itself is outside the exemption's objective.

In 1933, when the state transportation tax was first imposed, state highway funds were spent only on state highways and on county roads in unincorporated areas. City streets had no aid from the state, hence the taxing statute generally aimed to avoid taxation of carriers who operated entirely within city boundaries.[3] Many motor carriers, of course, used city streets as an adjunct to intercity hauls. Some carriers attempted to reduce their state taxes by segregating income from urban activities from that arising from intercity hauls, hopefully prorating their gross receipts in such a way as to escape taxation of the former. Most of these attempts met with judicial rebuff. (See *Santa Fe Transp.* v. *State Bd. of Equal.* (1959) 51 Cal.2d 531 [334 P.2d 907]; *Bekins Van Lines, Inc.* v. *Johnson* (1942) 21 Cal.2d 135 [130 P.2d 421]; *So. Cal. Freight Lines* v. *St. Bd. of Equal.* (1945) 72 Cal.App.2d 26 [163 P.2d 776]; cf. *Cal. Motor etc. Co.* v. *State Bd. of Equal.* (1947) 31 Cal.2d 217 [187 P.2d 745].) In another instance an urban bus company's gross receipts from five bus routes were subjected to the state tax because the five routes projected a short distance outside the city limits. (*San Diego etc. Ry. Co.* v. *Bd. of Equal.* (1948) 89 Cal.App.2d 267 [200 P.2d 573].)

In view of such decisions, city taxes on combined urban-rural transportation would expose some carriers to the inequity of double taxation.

---

[3]*Stadler* v. *State Bd. of Equalization* (1964) 227 Cal.App.2d 314, 324 [38 Cal. Rptr. 587]; 4 Assem. Interim Com. Report No. 8, Revenue and Taxation, California's Tax Structure: 1964 (Jan. 1964) page 103. Only with the enactment of the Collier-Burns Highway Act (Stats. 1947, First Ex. Sess., ch. 11) did the state commence distributing street subventions to cities. There was no corresponding change in the Motor Vehicle Transportation License Tax Law, which continued its exemption of exclusively intracity transportation.

Subdivision (c) of section 9653 was adopted in 1955 for the apparent purpose of providing partial protection for such carriers. The protection was partial because it was restricted to passenger operations and to city taxes which were measured by gross receipts. When the specifications of the exemption statute were met, an urban-rural passenger carrier would be permitted to make an otherwise impermissible apportionment between urban and rural gross receipts, thus escaping state taxes on the former.

■ A city has power to impose taxes and business license fees on transportation companies, although in the case of a multi-city carrier the exaction must be apportioned to the carrier's local business. (*City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108, 123-124 [93 Cal.Rptr. 1, 480 P.2d 953]; *Willingham Bus Lines, Inc.* v. *Municipal Court* (1967) 66 Cal.2d 893, 896-897 [59 Cal.Rptr. 618, 428 P.2d 602].) ■ In imposing that kind of exaction, the city asserts its role as a political sovereignty, exercising governmental powers delegated to it by the Constitution and state law. (Cal. Const., art. XI, §§ 5, 7; Gov. Code, § 37101.) In minimizing the potential of double taxation, the exemption provision of the Motor Vehicle Transportation License Tax Law looks to the city in its role as a political sovereignty and to financial levies imposed by it in that capacity.

No matter what its formula, the airport fee paid by Yellow Cab was not a species of tax. Whether San Francisco was acting in a governmental capacity or as an airport proprietor, it was not levying a general exaction on transportation business conducted within its corporate boundaries. Like any proprietor of a diversified business, San Francisco was granting an exclusive portion of the business to a concessionaire. In return for its monthly payment Yellow Cab became a concessionaire, no less than the newsstand concessionaire and the cafe concessionaire.

The dangers of literalness are accentuated here, because the exemption statute refers to a municipal franchise or license fee as well as a tax. The airport exaction paid by Yellow Cab was not a tax but might fairly be called a franchise or license fee. A franchise or license may be the product of either governmental or private action. A municipality may grant franchises, business licenses and licenses to use real estate, exacting fees when appropriate. (See *In re Petersen* (1958) 51 Cal.2d 177, 183 [331 P.2d 24, 77 A.L.R.2d 1291]; *Copt-Air* v. *City of San Diego* (1971) 15 Cal. App.3d 984, 987-988 [93 Cal.Rptr. 649].) A private entrepreneur may grant a franchise, in the sense of a privilege of marketing his product or service or of utilizing his business format. A landowner may grant a license, in the sense of a permit to use his land.

As owner and operator of the airport, San Francisco was clothed simultaneously in governmental and proprietary garb. In the terminology of the exemption statute, the privilege it granted Yellow Cab might be labeled a franchise or license and the "off-passenger" exaction viewed as a fee. All these words lead nowhere. The point of the matter is that the fee did not expose Yellow Cab to simultaneous taxation by the state and the municipality covering gross receipts from transportation within the latter's boundaries. Regardless of the formula used to fix the fee, it was wholly alien to the objective of the exemption law.

The conditions of section 9653, subdivision (c), were not fulfilled, and Yellow Cab was not entitled to segregate and secure an exemption for that portion of its gross receipts attributable to the San Francisco segment of the airport journey. The trial court properly ordered repayment of the tax refund.

Judgment affirmed.

Regan, J., and Janes, J., concurred.